No. 21-50607

# In the United States Court of Appeals for the Fifth Circuit

———————

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

v.

THOMAS ALAN ARTHUR,
DEFENDANT-APPELLANT

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, PECOS DIVISION,
HON. DAVID COUNTS, UNITED STATES DISTRICT JUDGE
NO. 4:19-CR-00774

———————

APPELLEE'S BRIEF FOR THE UNITED STATES

———————

ASHLEY C. HOFF
    United States Attorney
    Western District of Texas

MONICA R. MORRISON
    Assistant United States
    Attorney
    Middle District of Tennessee

AUSTIN M. BERRY
    Trial Attorney, Child
    Exploitation and Obscenity
    Section
    Criminal Division

KENNETH A. POLITE, JR.
    Assistant Attorney General

LISA H. MILLER
    Principal Deputy Assistant Attorney
    General

ANN O'CONNELL ADAMS
    Criminal Division, Appellate Section
    U.S. Department of Justice
    950 Pennsylvania Ave. NW, Rm. 1517
    Washington, DC 20530
    (202) 514-4086
    ann.adams@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The government does not oppose the request of appellant Thomas Alan Arthur for oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.......................................i

TABLE OF CONTENTS ....................................................................ii

TABLE OF AUTHORITIES .............................................................. v

JURISDICTIONAL STATEMENT............................................................ 1

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE ..................................................................... 2

      A.    Procedural History............................................................ 2

      B.    Factual Background ........................................................... 2

          1.    Arthur's website "Mr. Double" ................................ 2

          2.    The Indictment ........................................................ 5

          3.    The *Miller* Obscenity Standard.................................. 5

          4.    The Specific Offense Conduct .................................. 7

          5.    The Trial Proceedings ............................................ 11

          6.    Conviction and Sentence........................................ 12

      C.    Rulings Under Review ...................................................... 13

SUMMARY OF ARGUMENT ..................................................................... 13

ARGUMENT ........................................................................................... 15

     I.    THE DISTRICT COURT PROPERLY DENIED ARTHUR'S REQUEST FOR COPIES OF THE OBSCENE STORIES AND IMAGES ........................................................ 16

      A.    Background .................................................................... 16

B.     Standard Of Review.......................................................... 17

C.     The District Court Did Not Abuse Its Discretion In Declining To Allow Arthur To Copy The Obscene Stories And Images.......................................................... 18

II.     THE DISTRICT COURT PROPERLY EXCLUDED THE PURPORTED EXPERT TESTIMONY OF DR. DAVID LEY .................................................................................... 21

A.     Background...................................................................... 21

B.     Standard Of Review.......................................................... 25

C.     The District Court's Decision To Exclude Dr. Ley's Testimony Was Not Manifestly Erroneous ...................... 26

III.     THE STORIES POSTED ON ARTHUR'S WEBSITE ARE OBSCENE UNDER THE *MILLER* DEFINITION .................. 30

A.     Background...................................................................... 30

B.     Standard Of Review.......................................................... 31

C.     The Evidence Establishes That The Stories On Arthur's Website Lack Serious Literary, Artistic, Political, Or Scientific Value............................................................... 32

IV.     SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING THAT THE IMAGES DISPLAYED ON ARTHUR'S WEBSITE DEPICT MINORS ............................. 37

A.     Background...................................................................... 38

B.     Standard Of Review.......................................................... 38

C.     The Evidence Was Sufficient For The Jury To Determine That The Images on Arthur's Website Depict Minors ................................................................ 39

iii

V.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF OBSCENITY ............. 44

    A.    Background .................................................................... 44

    B.    Standard Of Review ....................................................... 46

    C.    The District Court Did Not Abuse Its Discretion By Giving The Fifth Circuit's Pattern Instruction On Obscenity ...................................................................... 46

VI.    THE SENTENCE IMPOSED BY THE DISTRICT COURT IS PROCEDURALLY REASONABLE ................................. 49

    A.    Background .................................................................... 50

    B.    Standard Of Review ....................................................... 53

    C.    The District Court Did Not Rely On Any Clearly Erroneous Facts In Imposing Arthur's Sentence ............... 53

CONCLUSION ........................................................................... 57

# TABLE OF AUTHORITIES

## Cases

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v.
  *Massachusetts*,
  383 U.S. 413 (1966) ................................................................. 33

*Ashcroft* v. *ACLU*,
  535 U.S. 564 (2002) ................................................................. 6

*Ashcroft* v. *Free Speech Coalition*,
  535 U.S. 234 (2002) .............................................................18, 38

*Bocanegra* v. *Vicman Servs., Inc.*,
  320 F.3d 581 (5th Cir. 2003) .................................................26, 29

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485 (1984) ................................................................. 32

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................21, 25, 26, 27

*Ginzburg* v. *United States*,
  383 U.S. 463 (1966) ................................................................. 33

*Hamling* v. *United States*,
  418 U.S. 87 (1974) ...................................................... 6, 26, 29, 37

*Huss* v. *Gayden*,
  571 F.3d 442 (5th Cir. 2009) ................................................... 28

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
  552 F.3d 93 (2d Cir. 2008) ...................................................... 20

*Kaplan* v. *California*,
  413 U.S. 115 (1973) .........................................................28, 36, 37

*Kois* v. *Wisconsin*,
  408 U.S. 229 (1972) ................................................................. 33

*Miller* v. *California*,
  413 U.S. 15 (1973) ........................................................... passim

*Paris Adult Theatre I* v. *Slaton*,
   413 U.S. 49 (1973) .................................................................23, 24, 28, 37

*Penthouse Int'l, Ltd.* v. *McAuliffe*,
   610 F.2d 1353 (5th Cir. 1980) ........................................................ 7, 32

*Pope v. Illinois*,
   481 U.S. 497 (1987) ............................................................................ 32

*Roth* v. *United States*,
   354 U.S. 476 (1957) .............................................................................. 6

*United States* v. *12 200-ft. Reels of Super 8mm Film*,
   413 U.S. 123 (1973) .............................................................................. 6

*United States* v. *Arrieta*,
   862 F.3d 512 (5th Cir. 2017) .............................................................. 38

*United States* v. *Bowersox*,
   72 M.J. 71 (C.A.A.F. 2013) ................................................... 41, 42, 44

*United States* v. *Cooks*,
   589 F.3d 173 (5th Cir. 2009) .............................................................. 27

*United States* v. *Dailey*,
   868 F.3d 322 (5th Cir. 2017) ................................................... 17, 20, 21

*United States v. Eustice*,
   952 F.3d 686 (5th Cir. 2020) .............................................................. 54

*United States* v. *Eychaner*,
   326 F. Supp. 3d 76 (E.D. Va. 2018) ................................................... 41

*United States* v. *Floyd*,
   343 F.3d 363 (5th Cir. 2003) .............................................................. 31

*United States* v. *Groner*,
   479 F.2d 577 (5th Cir. 1973) (en banc) .............................................. 37

*United States* v. *Handley*,
   564 F. Supp. 2d 996 (S.D. Iowa 2008) ............................................... 42

vi

*United States* v. *Horn*,
  187 F.3d 781 (8th Cir. 1999) ...........................................................19, 20

*United States* v. *Husband*,
  246 F. Supp. 2d 467 (E.D. Va. 2003) ..................................................... 19

*United States* v. *Kimbrough*,
  69 F.3d 723 (5th Cir. 1995) ....................................................... 19, 20, 21

*United States v. Leontaritis*,
  977 F.3d 447 (5th Cir. 2020) .................................................................. 57

*United States* v. *Linetsky*,
  533 F.2d 192 (5th Cir. 1976) .................................................................. 32

*United States* v. *McCoy*,
  602 Fed. Appx. 501 (11th Cir. 2015)...................................................34, 37

*United States* v. *Muhammad*,
  14 F.4th 352 (5th Cir. 2021) ................................................................... 49

*United States v. Peterson*,
  977 F.3d 381 (5th Cir. 2020) ...................................................... 53, 54, 55

*United States* v. *Ragsdale*,
  426 F.3d 765 (5th Cir. 2005) .......................................................... passim

*United States* v. *Reed*,
  908 F.3d 102 (5th Cir. 2018) .................................................................. 26

*United States* v. *Rowan*,
  530 F.3d 379 (5th Cir. 2008) .................................................................. 53

*United States* v. *Schales*,
  546 F.3d 965 (9th Cir. 2008) ...............................................................39, 42

*United States* v. *Schein*,
  31 F.3d 135 (3d Cir. 1994) ..................................................................... 35

*United States* v. *Silva*,
  794 F.3d 173 (1st Cir. 2015) .................................................................. 28

*United States* v. *Slepicoff*,
   524 F.2d 1244 (5th Cir. 1975) ................................................. 37

*United States* v. *Stevens*,
   559 U.S. 460 (2010) .......................................................... 5, 36

*United States* v. *Thevis*,
   484 F.2d 1149 (5th Cir. 1973) ............................................ 5, 37

*United States* v. *Whitfield*,
   590 F.3d 325 (5th Cir. 2009) ...................................... 46, 47, 49

*United States* v. *Whorley*,
   550 F.3d 326 (4th Cir. 2008) ......................................... passim

**Statutes**

18 U.S.C. § 25 ...................................................................... 39

18 U.S.C. § 1461 .................................................................. 19

18 U.S.C. § 1462 .......................................................... passim

18 U.S.C. § 1466 .......................................................... passim

18 U.S.C. § 1466A ....................................................... passim

18 U.S.C. § 2232 .................................................................. 43

18 U.S.C. § 2252A ................................................................ 56

18 U.S.C. § 2256 .............................................................18, 44

18 U.S.C. § 3231 .................................................................... 1

18 U.S.C. § 3509 .........................................................16, 17, 18, 19

18 U.S.C. § 3553 ...................................................... 52, 53, 56

28 U.S.C. § 1291 .................................................................... 1

Adam Walsh Child Protection and Public Safety Act of 2006,
   Pub. L. No. 109-248 (2006) ............................................... 19

The PROTECT Act of 2003,
    Pub. L. No. 108-21 (2003) ........................................................................ 39

**Other Authorities**

Fifth Cir. Pattern Jury Instruction (Criminal Cases)
    2.60 (2019 ed.) ........................................................................................ 44

Guidelines § 1B1.3 ........................................................................... 51, 52

Guidelines § 5G1.2 ................................................................................ 56

**Rules**

Fed. R. App. P. 4 ..................................................................................... 1

Fed. R. Crim. P. 16 ...................................................................... passim

Fed. R. Crim. P. 29 ........................................................................ 30, 38

Fed. R. Evid. 401 ................................................................................. 26

Fed. R. Evid. 403 ........................................................................... 26, 28

Fed. R. Evid. 702 ........................................................................... 26, 27

## JURISDICTIONAL STATEMENT

Defendant Thomas Alan Arthur appeals from a final judgment in a criminal case.  The district court had jurisdiction under 18 U.S.C. 3231 and entered an amended judgment on July 6, 2021.  ROA.712-720.  Arthur filed a timely notice of appeal on June 22, 2021.  ROA.697-698; see Fed. R. App. P. 4(b)(2).  This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court properly denied Arthur's discovery request for copies of the obscene images and stories charged in the complaint.

2.    Whether the district court properly excluded the testimony of defense expert Dr. David Ley.

3.    Whether sufficient evidence supports the jury's determination that the stories charged in Counts 2 through 6 plus two other stories written by Arthur are obscene.

4.    Whether sufficient evidence supports the jury's determination that the obscene drawings charged in Counts 1, 8, and 9 depict minors.

5.    Whether the district court properly instructed the jury on the elements of obscenity.

6.    Whether the 480-month sentence imposed by the district court is procedurally reasonable.

## STATEMENT OF THE CASE

### A.    Procedural History

Following a jury trial in the United States District Court for the Western District of Texas, Thomas Alan Arthur was convicted on three counts of producing, distributing, receiving, and possessing with intent to distribute obscene visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. 1466A(a)(1); five counts of using an interactive computer service for the transportation of obscene matters, in violation of 18 U.S.C. 1462(a); and one count of engaging in the business of selling or transferring obscene matters, in violation of 18 U.S.C. 1466(a).  ROA.712.  The district court sentenced Arthur to 480 months of imprisonment, to be followed by three years of supervised release.  ROA.714-715.

### B.    Factual Background

#### 1.    Arthur's website "Mr. Double"

From the early 1990s until 2019, Arthur operated a website called "Mr. Double" from his home in Terlingua, Texas.  ROA.1089-1092, 1100, 1191, 1225-1228.  The website, which was hosted on a server in the Netherlands, contained more than 25,000 stories, written by thousands of authors, that described the sexual abuse, rape, torture, and killing of children.  ROA.1090, 1093, 1102, 1111-1112, 1174, 1204-1205, 1235-1236, 1263, 1267-1269.

2

Any person visiting Arthur's website could see a limited portion of the website's contents and get a general sense for what was available on the site, but a paid subscription was necessary to read the stories in their entirety. ROA.1092-1094, 1234-1235, 1238, 1277. The stories were submitted by users, who in return received complimentary access. ROA.1094. Arthur encouraged authors to use a "pen name" different from what they typically used on other websites so that their identities could remain secret. ROA.1157. Authors selected names such as "Baby Raper," "babyNpop," "Child Raper," "Child Slayer," "Childs Play," "Daddy Do Right," "Preteen Pleasures," and "Pedo Phil." ROA.1175, 1196, 1198.

At the beginning of each story, a list of codes or abbreviations previewed the story's content. ROA.1097, 1106-1107. For example, "INC" indicates incest, "PED" is the code for pedophilia, "NC" stands for non-consensual, "WS" stands for water sports (meaning that the story involves urine), and "SCAT" is the code for scatology (a story involving feces). ROA.1097, 1134. Users could search the site by category. ROA.1199. Arthur personally approved all content posted on the website, including the stories and the profile images of the website's users. ROA.1140, 1200-1201, 1273-1274.

The Mr. Double website was the only source of income for Arthur and his wife. ROA.1112-1114, 1263-1264, 1267. Subscribers paid by credit card or by

sending a check to a mail-forwarding service, and the subscription payments were deposited into an account at Fort Davis State Bank. ROA.1112, 1264-1265. At one point, Arthur received a letter asking him to visit the bank in person for a conversation. ROA.1265. Arthur refused, so the bank closed his account and Arthur switched to another bank. ROA.1265-1266. Arthur created corporations called AOK Contractors, Spring Creek, and SC Prod, Inc. to transact business for his website so that users could disguise subscription payments appearing in their records. ROA.1123-1124, 1266-1267, 1295-1296. On multiple occasions, credit card processors shut down Arthur's merchant account after learning about the content of his website. ROA.1269-1272. Arthur eventually opened a merchant account in his wife's name to keep the business running. ROA.1269.

The Arthurs' home in Terlingua was remote, isolated, and surrounded by security cameras. ROA.1091, 1116-1118, 1223, 1258-1261. When Arthur and his wife would leave town for an extended period of time, one of a select few trusted users from the Mr. Double website would travel to Terlingua to house-sit for Arthur and keep an eye on his computer equipment. ROA.1275-1276. When officers executed a search warrant at Arthur's home, they found computer hard drives that had been burned or otherwise destroyed buried throughout the property. ROA.1125-1126.

### 2. The Indictment

In October 2020, a grand jury in the Western District of Texas returned a second superseding indictment charging Arthur with three counts of producing, distributing, receiving, and possessing with intent to distribute obscene visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. 1466A(a)(1); five counts of using an interactive computer service to transport obscene matters, in violation of 18 U.S.C. 1462(a); and one count of engaging in the business of selling or transferring obscene matters, in violation of 18 U.S.C. 1466(a). ROA.192-196. The indictment focused on specific images and stories found on Arthur's website, described in more detail below.

### 3. The *Miller* Obscenity Standard

The meaning of "obscene" in 18 U.S.C. 1462, 1466, and 1466A derives from First Amendment law. See *United States* v. *Thevis*, 484 F.2d 1149, 1155 (5th Cir. 1973). The First Amendment generally prohibits the punishment of speech based on its content except for speech in certain historically unprotected categories, including obscenity. See, *e.g.*, *United States* v. *Stevens*, 559 U.S. 460, 468-469 (2010). As a result, to avoid any doubt as to their constitutionality, federal obscenity statutes are construed to reach only material that qualifies as unprotected obscenity under the First Amendment. *Ashcroft* v. *ACLU*, 535 U.S.

564, 581 n.11 (2002); *Hamling* v. *United States*, 418 U.S. 87, 113-114 (1974);

*United States* v. *12 200-ft. Reels of Super 8mm Film*, 413 U.S. 123, 130 n.7 (1973).

The Supreme Court set forth the controlling definition of obscenity in *Miller* v. *California*, 413 U.S. 15 (1973). *Miller* held that the First Amendment allows the regulation of "works [1] which, taken as a whole, appeal to the prurient interest in sex, [2] which portray sexual conduct in a patently offensive way, and [3] which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 24. The Court explained that the "basic guidelines for the trier of fact must be":

> (a)    whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;[1]
>
> (b)    whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable [statute]; and
>
> (c)    whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Ibid.* (internal citations and quotation marks omitted). Thus, in a prosecution under 18 U.S.C. 1462, 1466, or 1466A, the government must prove beyond a

---

[1]    A work appeals to the prurient interest in sex if it "has a tendency to excite lustful thoughts" or appeals to a "shameful or morbid interest in nudity, sex, or excretion." *Roth* v. *United States*, 354 U.S. 476, 486, 488 n.20 (1957) (internal citation and quotation marks omitted).

reasonable doubt that the material at issue satisfies each of those three elements. See *Penthouse Int'l, Ltd.* v. *McAuliffe*, 610 F.2d 1353, 1363 (5th Cir. 1980).

### 4.    The Specific Offense Conduct

#### a.    *The Visual Depictions*

In Counts 1, 8, and 9, Arthur was charged with producing, distributing, receiving, or possessing with intent to distribute "a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting," that (i) depicts a minor engaging in sexually explicit conduct and (ii) is obscene. 18 U.S.C. 1466A(a)(1); see ROA.192, 195-196.

The image charged in Count 1, which is the profile image for a user called "Netman169," is a drawing of a "prepubescent or pubescent . . . female child lying nude." ROA.1098, GX 10A.[2] The drawing focuses on the child's breasts and genitals and she appears to be masturbating. ROA.1098; GX 10A. Netman169's biography on the website, viewable next to the profile image, states that he specializes in stories about little girls having sex and was inspired by a story he heard as a teenager from a friend who had "arranged for three high school boys to take turns fucking his ten-year-old fifth grade sister." ROA.1457; see ROA.1098-1099; GX 10A.

---

[2]      "GX" refers to government exhibits admitted at the trial.

The image charged in Count 8 is a drawing that serves as the profile image for a user called "loadthemule." ROA.1130. It depicts a prepubescent girl with pigtails lying on her stomach on a bed. ROA.1458; GX 12A. She is performing fellatio on an adult man with a white substance around her mouth, and the size of her head is less than the visible length of the penis in her mouth. ROA.1458; GX 12A. The man is pulling on the girl's pigtails while wearing brown work gloves. ROA.1458; GX 12A. The girl's chest is visible, and she has no breast development. ROA.1458; GX 12A.

The image charged in Count 9 is the profile image for a user called "girls_suck." ROA.1130. The image resembles a Japanese anime drawing and depicts three prepubescent girls with pigtails each performing fellatio on an adult male penis. ROA.1457; GX 11A. The penises are large in comparison to the size of the girls. GX 11A. The girls are clothed, but one has her dress lifted in front and has no pubic hair. GX 11A. A teddy bear is also visible on a towel rack in the background. GX 11A.

### b.   *The Written Stories*

In Counts 2 through 6, Arthur is charged with using an interactive computer service for the transportation of obscene writings. 18 U.S.C. 1462(a).

The writing charged in Count 2 is entitled "A Spectacle to Beat All Others" by a user called "babyNpop." ROA.1133, 1201-1202, 1458; GX 5A.

The story describes a dad and two other men vaginally and anally raping a baby girl and forcing her to perform fellatio. ROA.1458; GX 5A. The baby is described as being terrified, and she cries while encountering the men and being raped. GX 5A.

The writing charged in Count 3 is entitled "Baby Wank" by a user called "Evil Dad." ROA.1133, 1170, 1202, 1458; GX 6A. The story describes a 17-year-old father who is left home alone with his baby daughter while his wife is at work. GX 6A. The father masturbates using his baby daughter's body, makes the baby perform fellatio on him, ejaculates on the baby's body and face, and drinks the baby's urine. ROA.1458, GX 6A.

The writing charged in Count 4 is entitled "Buttfucking a 10-Year-Old-Girl" by user "Steven Seven." ROA.1133-1134, 1458, GX 7A. In this story, an adult man drugs and kidnaps a 10-year-old girl, then repeatedly orally and anally rapes her and urinates in her mouth. ROA.1458; GX 7A. The girl is terrified and sobbing during the encounter. GX 7A. In the end, the girl becomes his willing partner and "sex slave." GX 7A.

The fourth story, charged in Count 5, is entitled "Replacing My Wife – She Had It Coming" by a user called "BabyRaper." ROA.1134, 1458; GX 8A. In this story, an adult male has sex with his 10-year-old daughter, then plots to kill his other daughters when he discovers they are products of his wife's affair.

GX 8A.  The man rapes his five-year-old daughter, kills her, then continues to have sex with her dead body in front of the child's mother.  ROA.1458; GX 8A. The man then rapes, kills, and engages in necrophilia with his three-year-old and 18-month-old daughters.  GX 8A.  Finally, he removes a baby from his pregnant wife's womb, rapes and kills the baby, then rapes his wife using the dead baby "as a condom" and kills her, leaving him to live happily with the 10-year-old daughter.  ROA.1458; GX 8A.

The story charged in Count 6 is entitled "The Baby Mangler" by user "Lachurna."  ROA.1135, 1203, 1458; GX 9A.  In this story, an adult man abducts a female toddler from a park, fondles the child's nipples, vagina, and anus while she cries and screams in pain, and then vaginally and anally rapes her.  ROA.1458; GX 9A.  The child chokes, coughs up blood, and dies from internal injuries.  ROA.1458; GX 9A.  The man then ejaculates into the child's dead body and throws the body into a hole.  GX 9A.

### c.    *The Stories Written by Arthur*

In Count 7, Arthur is charged with engaging in the business of selling or transferring obscene matters, in violation of 18 U.S.C. 1466(a).  The jury was instructed that if it found petitioner guilty on this charge, it must specify which stories and/or drawings it found obscene.  ROA.554.  On a special verdict form, the jury listed the three images described in Counts 1, 8, and 9; the stories

described in Counts 2 through 6; and two additional stories written by Arthur himself that had been introduced at trial.  ROA.555.

In the story "Katrina and her Daddy," written by Arthur, the narrator describes moving to the desert with his 12-year-old daughter after her mother dies.  ROA.1103-1104, 1459, GX 35AA.  The narrator describes touching his daughter's buttocks and getting an erection, then having vaginal intercourse with her and ejaculating into her anus.  ROA.1459; GX 35AA.

Arthur's other story, "Tracy's Developing Breasts," describes a 17-year-old male who sexually abuses his 12-year-old sister.  ROA.1104, 1459; GX 35BB.  The brother describes masturbating on his sister's breasts and buttocks, inviting a friend to sexually abuse her, then drugging her by mixing pills in her food so that he could tie her to a bed with nylon stockings and vaginally rape her.  ROA.1459; GX 35BB.

### 5.    The Trial Proceedings

During trial, witnesses including federal agents and Arthur's wife described Arthur's operation of the Mr. Double website, and the government entered the drawings and stories charged in the indictment into evidence. R.1088-1303.  At the close of the government's case, Arthur moved for a judgment of acquittal on the grounds that (i) the United States had presented insufficient evidence that the materials lacked literary, artistic, political, or

scientific value under the third *Miller* prong; and (ii) the United States had failed to prove that the images depicted minors. ROA.1304. The district court denied the motion. ROA.1304-1305. Arthur presented no defense case. ROA.1307, 1310.

### 6.     Conviction and Sentence

The jury returned a guilty verdict on all counts. ROA.699. Arthur filed a post-verdict motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c). Similar to his previous motion, Arthur contended that (i) the government had failed to prove that the written stories are obscene because it did not distinguish them from famous works of art depicting sexual contact between adults and children; and (ii) the government failed to prove that the visual images depicted actual minors. ROA.578-591. The district court denied the motion. ROA.693-695.

The Probation Office calculated a Guidelines range of 360 to 1080 months of imprisonment. ROA.1471.[3] The district court sentenced Arthur to 480 months of imprisonment, to be followed by three years of supervised release. ROA.714-715.

---

[3]     Arthur was sentenced under the 2018 version of the Guidelines. ROA.1462.

### C.    Rulings Under Review

Arthur challenges his conviction and sentence.  ROA.712-720.  He also challenges the district court's pretrial discovery order denying his request to obtain copies of the materials charged in the indictment, ROA.148-151; the district court's ruling excluding the testimony of defense expert Dr. David Ley, ROA.597-605; and the district court's denial of his motion for a judgment of acquittal, ROA.693-695.

## SUMMARY OF ARGUMENT

1.    The district court properly denied Arthur's request for copies of the obscene images and stories.  Although the government must permit a defendant to copy certain materials under Federal Rule of Criminal Procedure 16(a)(1)(E), this Court has long recognized that the government need not allow the defense to copy items that are illegal contraband.  The materials here are contraband, and the district court therefore properly declined to allow copies, especially given its discretion to restrict discovery under Rule 16(d)(1).  Any error was also harmless because three defense experts reviewed the materials.

2.    The district court acted well within its discretion in excluding the testimony of defense expert Dr. David Ley.  The court reasonably determined that Dr. Ley was not qualified to give an opinion on the societal value of the materials at issue under the third *Miller* prong, as he had no degree or training in

art, literature, or politics, and his scientific knowledge about the value of pornography and erotica in preventing contact offenses against children was based solely on reading literature on the subject. Moreover, Dr. Ley's testimony was equivocal on scientific value, and he admitted that none of his trainings or lectures involved the type of material at issue here.

3.    The stories posted on Arthur's website are obscene. Under the third *Miller* prong, the jury reasonably determined that the materials lacked any serious literary, artistic, political, or scientific value. The stories are not serious works of art or literature. They are replete with crude and graphic descriptions of infants, toddlers, and prepubescent minors being raped and murdered. The United States was not required to call a witness to distinguish the stories from famous works of art that depict sexual contact between adults and minors.

4.    Sufficient evidence supports the jury's determination that the images posted on Arthur's website depict minors. Details in the images, such as hairstyle, physical features, and the size of the girls relative to the adults with whom they are engaging in sexual activity provide adequate support for the jury's finding. The United States was not required to prove that the images depict actual minors and not fictional characters. Section 1466A covers drawings and cartoons, and Section 1466A(c) provides that "[i]t is not a required element of any offense under this section that the minor depicted actually exist."

14

5.     The district court did not abuse its discretion by giving this Court's pattern instruction on obscenity without the modifications requested by Arthur. The district court correctly instructed the jury on the elements of the *Miller* obscenity test and explained the government's burden to prove all three elements.

6.     The 480-month sentence imposed by the district court is procedurally reasonable. The court did not base its sentence on unreliable facts in the Presentence Investigation Report. It reasonably found that FBI interview summaries from women who were sexually abused by Arthur were reliable. And in any event, the district court did not explicitly rely on that information and stated that it would have imposed a 480-month sentence even if it had granted all of Arthur's objections.

## ARGUMENT

Arthur contends that he is entitled to reversal of his convictions based on insufficient evidence that the stories charged in the indictment are obscene or that the images depict minors; a new trial based on the district court's evidentiary and discovery rulings; and a new sentencing proceeding based on the district court's consideration of purportedly unreliable information at sentencing. For the reasons set forth below, Arthur's conviction and sentence should be affirmed.

## I.   THE DISTRICT COURT PROPERLY DENIED ARTHUR'S REQUEST FOR COPIES OF THE OBSCENE STORIES AND IMAGES

Arthur contends (Br. 9-16) that the district court improperly prohibited the defense from copying the obscene stories and images charged in the indictment, which inhibited his ability to retain defense experts.  The Court should reject that argument.

### A.   Background

In April 2020, Arthur requested from the district court an order pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E) allowing him to obtain copies of the obscene material described in the indictment.  ROA.104-112.  Rule 16(a)(1)(E) provides that the government must permit a defendant to inspect and copy items that (i) are material to preparing the defense; (ii) are intended to be used in the government's case in chief; or (iii) were obtained from the defendant. Fed. R. Crim. P. 16(a)(1)(E).

Arthur acknowledged that Congress has exempted child pornography from Rule 16(a)(1)(E), see 18 U.S.C. 3509(m)(2)(A), but he argued that the materials described in the indictment are not child pornography and therefore copies must be provided.  ROA.104-108.  Arthur stated that he needed copies of these materials so that potential experts could view them.  ROA.109-110.  He further stated that the government had declined a request to make the materials

available in a location that was more convenient to his experts than the FBI Office in Alpine, Texas, or the federal courthouse in Pecos, Texas. ROA.109-110, 131.

A magistrate judge determined that 18 U.S.C. 3509(m)(2)(A) prohibited releasing copies of the items to Arthur but ordered the government to make the items available at the FBI Office in Midland, Texas, in addition to Alpine and Pecos. ROA.142, 820. The district court determined that the magistrate judge's decision was not clearly erroneous and stated that the materials should not be copied "out of an abundance of caution" because at least some of the materials were "[a]rguably" child pornography and it was unclear at that early stage whether the images and stories involved real children. ROA.149-150. In May 2020, defense experts Dr. Elizabeth Richmond-Garza and Professor Carol Fairlie viewed the materials at the FBI Offices in Midland and Alpine, respectively. ROA.491. In August 2020, defense expert Dr. David Ley reviewed the materials at the FBI office in Alpine. ROA.226, 349.

## B.    Standard Of Review

This Court reviews alleged errors in the administration of discovery rules for abuse of discretion and will not reverse on that basis "unless a defendant establishes prejudice to his substantial rights." *United States* v. *Dailey*, 868 F.3d 322, 327 (5th Cir. 2017).

### C.    The District Court Did Not Abuse Its Discretion In Declining To Allow Arthur To Copy The Obscene Stories And Images

Federal Rule of Criminal Procedure 16(a)(1)(E) provides that the government must permit the defendant to inspect and copy materials in the government's possession, custody, and control if (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief; or (iii) the item was obtained from or belongs to the defendant. Congress has exempted child pornography (as defined in 18 U.S.C. 2256(8)) from this requirement and affirmatively prohibits a defendant from copying such materials so long as the government makes the material reasonably available to the defendant. See 18 U.S.C. 3509(m)(2)(A).

The government agrees that the images and stories charged in the indictment are not child pornography.[4]  However, even before Congress enacted

---

[4]    The images charged in Counts 1, 8, and 9 may fall within the definition of "child pornography" as set forth in 18 U.S.C. 2256(8)(B), which covers so-called "virtual child pornography," defined as "a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct." See *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 241 (2002) (stating that "the literal terms of [18 U.S.C. 2256(8)(B)] embrace a Renaissance painting depicting a scene from classical mythology, a 'picture' that 'appears to be, of a minor engaging in sexually explicit conduct.'"). In *Free Speech Coalition*, however, the Supreme Court found Section 2256(8)(B) to be overbroad because it "abridges the freedom to engage in a substantial amount of lawful speech." 535 U.S. at 256. In any event, the written stories are not child pornography because they are not images. See 18 U.S.C. 2256(8) ("child pornography" is a "visual depiction").

Section 3509(m) as part of the Adam Walsh Child Protection and Public Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587 (2006), this Court had determined that it was reasonable for the government to refuse a defendant's request to copy child pornography on the ground that the materials are illegal contraband. *United States* v. *Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1995) ("Child pornography is illegal contraband. We decline to find that Rule 16 provides such contraband can be distributed to, or copied by, the defense.") (internal citation omitted); see also *United States* v. *Horn*, 187 F.3d 781, 792 (8th Cir. 1999); *United States* v. *Husband*, 246 F. Supp. 2d 467, 468-469 (E.D. Va. 2003). The obscene images and stories that Arthur sought to copy are likewise contraband. It is illegal to mail them or to send or receive them over the Internet, 18 U.S.C. 1461, 1462; and because the visual depictions show minors engaging in sexually explicit conduct, it is illegal to receive them, distribute them, or possess them with intent to distribute, 18 U.S.C. 1466A(a)(1). Accordingly, the district court did not abuse its discretion in refusing to allow the drawings and stories to be copied. *Kimbrough*, 69 F.3d at 731.

Moreover, Federal Rule of Criminal Procedure 16(d)(1) provides that "[a]t any time the [district] court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Here, the district court acted well within that discretion by denying copies of the obscene

19

materials and ordering the government to make them available for inspection at the FBI Office in Midland, Texas—in addition to Alpine and Pecos. See *Horn*, 187 F.3d at 792 (stating in a pre-Adam Walsh Act case that Rule 16(d)(1) conferred discretion on the district court to restrict access to child pornography notwithstanding the requirement to provide copies to the defense); *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 122 (2d Cir. 2008) (noting that Rule 16(d)(1) provides the district court with discretion to limit discovery).

In any event, any error in the district court's application of the discovery rule was harmless. See *Kimbrough*, 69 F.3d at 731 (stating that "even if there was a Rule 16 violation," the defendant "failed to demonstrate that any actual prejudice arose from his inability to procure copies of the charged items"); *Dailey*, 868 F.3d at 327 (reversal for error in administration of discovery rules is unwarranted unless defendant establishes prejudice). Three defense experts visited the FBI Offices in Alpine and Midland to review the materials, including the expert Arthur selected for trial. ROA.226, 349, 491.

Arthur observes (Br. 15-16) that the district court did not permit his chosen expert to testify and contends that if he had been able to copy the materials, he could have provided them to many additional experts to find someone who would testify that the materials are not obscene. The Court should reject that argument. This Court has previously held that a defendant's conclusory

assertion that he was unable to obtain an expert for trial when the government refused to allow the defense to make copies of child pornography was insufficient to establish prejudice.  See *Kimbrough*, 69 F.3d at 731.  Defense counsel, who are familiar with the materials and could have described them to potential experts to determine whether a trip to west Texas for viewing was warranted, ROA.491, have identified no expert that would be willing to testify that this type of material has serious value but was unwilling to visit a government office in Texas to view them.  It is Arthur's burden to show prejudice, *Dailey*, 868 F.3d at 327, and his failure to identify any specific harm precludes relief.

## II.   THE DISTRICT COURT PROPERLY EXCLUDED THE PURPORTED EXPERT TESTIMONY OF DR. DAVID LEY

Arthur contends (Br. 17-33) that the district court abused its discretion by excluding testimony from a clinical psychologist and sex therapist, Dr. David Ley.  The court's ruling was not an abuse of discretion.

### A.   Background

1.   In December 2020, the United States filed a motion in limine seeking to exclude the testimony of Dr. David Ley or alternatively requesting a hearing under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  ROA.209-214.  In response, the defense provided the government with a written summary of Dr. Ley's anticipated testimony.  ROA.347-368.

Dr. Ley, a clinical psychologist licensed in New Mexico and North Carolina, ROA.348, described the stories and images at issue and stated that readers of the stories "may experience decreased risk of contact offending against children," ROA.350-353, 355-356, and might help social scientists and public policymakers to understand the psychological functioning of people with disordered sexuality, ROA.350-353, 355-356. With respect to the images, Dr. Ley stated that the drawing of the female child masturbating "reflects substantial artistic talent in depiction of correct anatomy, figure drawing, shading, texture and perspective"; the drawing of a female child performing fellatio "holds artistic value in its depiction of unreality and fantasy sexuality" and its "skilled" use of "texture, foreground and perspective"; and the drawing of three female children performing fellatio "holds artistic value in that it depicts unreality, and experiences impossible in the real world, allowing viewers to suspend disbelief." ROA.354-355.

2.     Before trial, the court conducted a *Daubert* hearing. ROA.847-913. At the hearing, Dr. Ley repeated the equivocal statements in his report, *i.e.*, that the images might prevent website users from contact offenses with children (or might not), and might help social scientists and public policymakers to understand the psychological functioning of people with disordered sexuality (or might not). ROA.868-870. Dr. Ley also acknowledged that he had never told

a patient to read stories about the rape and torture of infants and children as part of treatment, nor is he aware of any psychologists who have done so. ROA.885. In response to questions from the court, Dr. Ley testified that he believes all stories and drawings have literary value because they "are a production of the secret thoughts that are in the minds of people" which "helps [him] to understand [a] person more." ROA.892. Dr. Ley further opined that every story and drawing has artistic value, ROA.893; that "at a broad level" all stories and drawings have political value, ROA.893; and that he was stronger in his view that "all such material has some scientific value," ROA.894.

3.     At the conclusion of the hearing, the court excluded Dr. Ley's testimony. ROA.907-912. The court "ha[d] no question . . . that Dr. Ley would merely confuse the jury" on a topic it does not need help with. ROA.907; see ROA.908. The court explained that in *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49 (1973), the Supreme Court observed that obscenity "is not a subject that lends itself to the traditional use of expert testimony." ROA.600 (quoting *Paris Adult Theatre I*, 413 U.S. at 56 n.6). Typically, the court explained, "expert testimony is provided to help jurors understand 'what they otherwise could not understand.'" ROA.600 (quoting *Paris Adult Theatre I*, 413 U.S. at 56 n.6). But "[n]o such assistance is needed by jurors in obscenity cases," because the

material itself is "the best evidence of what [it] represents." ROA.600 (quoting *Paris Adult Theatre I*, 413 U.S. at 56 & n.6).

The court explained that Dr. Ley was expected to testify on the third element of the *Miller* obscenity test, *i.e.*, whether the material, taken as a whole, lacks serious literary, artistic, political, or scientific value. ROA.600; see *Miller*, 413 U.S. at 24-25. The court determined that Dr. Ley was not qualified to testify as an expert about the serious literary, artistic, or political value of the stories and images because he did not have specialized knowledge, skill, training, or education in those fields. ROA.601. The court acknowledged that Dr. Ley had read scientific literature "containing an analysis of issues related to child pornography and written erotica as it relates to individuals who express a sexual interest in children and pedophilia," but the court explained that "reviewing scientific literature in an area outside his field as a clinical psychologist" does not make Dr. Ley qualified to testify as an expert on that topic. ROA.601. The court also acknowledged that Dr. Ley had trained other psychologists on the history of sexuality literature and the role of erotic writings in psychological treatment. ROA.602. But the court determined that these trainings did not qualify Dr. Ley to testify about the serious scientific value of written and visual depictions of the sexual abuse of babies and children, which "differs vastly from 'pornography' and 'erotic drawings.'" ROA.602.

24

The district court further determined that even if Dr. Ley was qualified, Arthur had failed to establish that Dr. Ley's opinion as to the literary, artistic, political, or scientific value of the materials was reliable. ROA.602-605. The court noted that Dr. Ley "admitted he did not have any expertise in politics." ROA.602. With respect to literary or artistic value, the court explained that the trainings conducted by Dr. Ley "focused on the use of the material to treat patients, not on the [literary or artistic] value of the material outside of treatment." ROA.603; see ROA.604-605. And as to scientific value, the court explained that none of the trainings conducted by Dr. Ley had focused on the type of material charged in this case—"the depiction of sexual abuse of babies and/or children." ROA.605. The court further observed that Dr. Ley testified he was unaware of any clinician—including himself—who had ever prescribed the type of materials at issue in this case as treatment for a patient. ROA.605. Accordingly, the court found "no evidence supporting the reliability of Dr. Ley's assertion that the material charged in this case has serious scientific value." ROA.605.

## B.     Standard Of Review

A district court's decision to exclude expert testimony after a *Daubert* hearing will not be disturbed on appeal unless it is "manifestly erroneous," which this Court defines as "a complete disregard for the controlling law."

*United States* v. *Reed*, 908 F.3d 102, 117 (5th Cir. 2018) (internal quotation marks omitted).  Any error is reviewed for harmlessness and the Court will reverse only based on a showing that the ruling affected the complaining party's substantial rights.  *Bocanegra* v. *Vicman Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

### C.   The District Court's Decision To Exclude Dr. Ley's Testimony Was Not Manifestly Erroneous

Evidence is admissible if its relevance is not substantially outweighed by the dangers of misleading the jury and confusing the issues.  Fed. R. Evid. 401, 403.  An expert may provide opinion testimony so long as the expert's specialized knowledge "will help the trier of fact to understand the evidence or determine a fact in issue"; the testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods"; and the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Under *Daubert*, the district court must determine whether the proposed expert testimony is relevant and reliable.  509 U.S. at 589.  In an obscenity case, the district court "has wide discretion" to admit or exclude expert testimony.  *Hamling*, 418 U.S. at 108.

1.   The district court's exclusion of Dr. Ley's testimony was well within its discretion.  The court reasonably determined that Dr. Ley was not qualified to give an expert opinion on the societal value of the materials at issue under the third *Miller* prong.  As the court explained, Dr. Ley does not have a degree in

literature, art, or politics, and thus was not qualified to testify as an expert on whether the stories and images had serious value in those fields.  ROA.601.  Arthur views this as a hyper-technical or "impossible" standard set by the district court (Br. 23-25), but the court must be "assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"  *United States* v. *Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702).

Although Dr. Ley is a sex therapist and may by virtue of that profession be qualified to testify about the *scientific* value of the materials here, the district court reasonably concluded that he was not.  Dr. Ley stated that he had "looked at the scientific literature" about child pornography and written erotica as it relates to "contact sexual offending against children."  ROA.850.  But as the district court pointed out, reading scientific literature does not make Dr. Ley an expert on that subject.  ROA.601.  Additionally, Dr. Ley's report was equivocal about the value of such works, stating that people who write stories about the sexual abuse of children "*may* experience decreased risk of contact offending against children."  ROA.350-353, 355-356 (emphasis added); see ROA.869 (confirming during *Daubert* hearing that engaging with such stories might not prevent website users from contact offending against children).  The district court did not abuse its discretion in finding Dr. Ley unqualified to testify on the

scientific value of these particular types of materials. See *Huss* v. *Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (district court should not allow an expert to testify if it finds the witness "is not qualified to testify in a particular field or on a given subject").

2.    Moreover, the district court was correct to question whether Dr. Ley's methodology for determining whether something had value would "truly assist the jury in evaluating" the materials. ROA.605. At the hearing, Dr. Ley essentially testified that all things have value, ROA.892-894, which the court rightly found would not help the jury evaluate the third *Miller* prong and would be confusing, ROA. 907-908; see Fed. R. Evid. 403; *United States* v. *Silva*, 794 F.3d 173, 179 (1st Cir. 2015) (district court did not abuse its discretion by excluding expert testimony in obscenity case after making a reasonable assessment of whether it would help the jury).

Although a jury is not prohibited from hearing expert testimony in an obscenity case, see *Kaplan* v. *California*, 413 U.S. 115, 121 (1973), it is also well-established that a jury can evaluate the third *Miller* prong without the assistance of an expert. *Paris Adult Theatre I*, 413 U.S. at 56 & n.6. Arthur's contention (Br. 21-23, 28, 32-33) that juries are generally unable to determine whether material has redeeming value without expert testimony and needed to learn about the history of erotica from Dr. Ley before it could assess the value of the

materials on Arthur's website has long been rejected by the Supreme Court and this Court. See pp. 36-37, *infra*.

In assessing the reliability of Dr. Ley's opinion on whether the materials had scientific value, the district court explained that Dr. Ley had conducted trainings and lectures on the treatment of people with sexuality and mental health issues, but he acknowledged that none of those lectures or trainings focused on the type of stories at issue here involving the rape and murder of babies and children, and Dr. Ley stated that he was not aware of any clinicians, including himself, who use such stories to treat patients. ROA.605, 885. Given the district court's broad discretion on the use of expert testimony in obscenity cases, *Hamling*, 418 U.S. at 108, Arthur has not shown that the district court manifestly erred in finding unreliable Dr. Ley's methodology for assessing whether the writings and stories from Arthur's website had value.

3.    Even if district court's evidentiary ruling was erroneous, Arthur has not demonstrated that the ruling affected his substantial rights. See *Bocanegra*, 320 F.3d at 584 (erroneous evidentiary rulings reviewed under harmless error standard). As explained above, Dr. Ley's testimony on the scientific value of the materials was equivocal. ROA.868-870; see ROA.350-353, 355-356. Testimony that the materials at issue may or may not prevent a person from sexually abusing children and may or may not help public policymakers to

understand the psychological functioning of people with disordered sexuality would not establish for the jury that the materials had "serious" scientific value. See *Miller*, 413 U.S. at 24.

## III. THE STORIES POSTED ON ARTHUR'S WEBSITE ARE OBSCENE UNDER THE *MILLER* DEFINITION

Arthur contends (Br. 42-49) that the stories charged in Counts 2 through 6, and the two additional stories written by him that the jury found obscene in support of Count 7, are protected by the First Amendment because the government failed to prove they lacked serious literary, artistic, political, or scientific value. The Court should reject that argument.

### A.    Background

At the close of the government's case and again after the jury returned its verdict, Arthur moved for a judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure. ROA.1304; ROA.578-591. With respect to the written stories charged in Counts 2 through 6, plus the two stories written by him that the jury listed on its special verdict form for Count 7, Arthur argued that the stories were not obscene because the government had presented insufficient evidence that the stories lacked serious literary, artistic, political, or scientific value. ROA.586.

The district court denied Arthur's Rule 29(c) motion. ROA.693-695. It explained that, "reviewing the evidence in the light most favorable to the

Government, with all reasonable inferences and credibility choices made in support of the jury verdict, . . . the jury had sufficient evidence from which it could find that the material charged was obscene." ROA.694. The court cited *United States* v. *Ragsdale*, 426 F.3d 765, 772 (5th Cir. 2005), to reinforce that the prosecution may prove that material is obscene under *Miller* "without resorting to any evidence or testimony other than the introduction of the allegedly offending materials themselves." ROA.694-695 (quoting *Ragsdale*, 426 F.3d at 772).

## B.    Standard Of Review

When reviewing a motion for judgment of acquittal, this Court will "affirm the jury's verdict if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Ragsdale*, 426 F.3d at 770-771 (quoting *United States* v. *Floyd*, 343 F.3d 363, 370 (5th Cir. 2003)).

In obscenity prosecutions, appellate courts also conduct an "independent review" of the material in question to determine whether it is obscene under the *Miller* criteria, to ensure that the judgment does not intrude on First Amendment rights. *Ragsdale*, 426 F.3d at 779-780; see *Bose Corp. v. Consumers*

*Union of United States, Inc.*, 466 U.S. 485, 504-507 (1984); *United States v. Linetsky*, 533 F.2d 192, 201-202 (5th Cir. 1976). This Court accordingly will make an independent judgment as to whether the material meets the *Miller* test for obscenity. *Ragsdale*, 426 F.3d at 780-781; *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1365-1366 (5th Cir. 1980).

### C. The Evidence Establishes That The Stories On Arthur's Website Lack Serious Literary, Artistic, Political, Or Scientific Value

1.     A video is "obscene" for purposes of the federal obscenity statutes only if it (i) appeals primarily to the prurient interest, (ii) depicts sexual conduct in a patently offensive way, and (iii) lacks serious literary, artistic, political, or scientific value. *Miller*, 413 U.S at 24. Arthur does not dispute that the stories in this case satisfy the first and second elements. He contends (Br. 47-49), however, that the stories do not meet the third element because the government failed to prove that the materials lacked serious literary, artistic, political, or scientific value. His argument does not withstand scrutiny.

The third prong of the *Miller* obscenity test requires the finder of fact to determine whether a "reasonable person" "would find serious literary, artistic, political, or scientific value in [the] allegedly obscene material." *Pope v. Illinois*, 481 U.S. 497, 500-501 (1987). The work need not be "utterly without redeeming social value," a standard that would require the "prosecution to prove a

negative" and would be "virtually impossible" for the government to prove beyond a reasonable doubt. *Miller*, 413 U.S. at 22; see *id.* at 24-25. It suffices if the work does "not have *serious* literary, artistic, political, or scientific value." *Id.* at 24 (emphasis added).

The work as a whole must be considered in the larger "context of the material." *Kois* v. *Wisconsin*, 408 U.S. 229, 231 (1972); see *Ginzburg* v. *United States*, 383 U.S. 463, 465-466 (1966). A work intended and used solely to appeal to the prurient interest of those who find it sexually arousing may lack serious societal value, for example, even if it might possess societal value when used to educate or in an attempt at serious art. *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Massachusetts*, 383 U.S. 413, 420-421 (1966).

2.    Sufficient evidence supports the jury's determination that the stories on Arthur's website lack serious literary, artistic, political, or scientific value. The stories, which were presented to the jury, were replete with crude and graphic descriptions of infants, toddlers, and prepubescent minors being raped and murdered for the sexual satisfaction of the stories' narrators. "A Spectacle to Beat All Others" (Count 2) involves the rape of a terrified baby by her father and then by other men while her father watches. ROA.1458; GX 5A. "Baby Wank" (Count 3) is about a young father who makes his 10-month-old baby perform fellatio on him, ejaculates on her, and drinks her urine. ROA.1458; GX

33

6A. "Buttfucking a 10-Year-Old Girl" (Count 4) features a kidnapping victim who is forced to repeatedly switch back and forth between being anally raped by her captor and performing fellatio on him, among other things. ROA.1458, GX 7A. In "Replacing My Wife – She Had It Coming" (Count 5), the narrator rapes and kills four of his daughters, including by suffocation with a plastic bag, has sex with their dead bodies, and ends with the narrator taking a near-term baby from his wife's womb, then raping and killing his wife using the dead baby "as a condom." ROA.1458; GX 8A. "The Baby Mangler" (Count 6) describes the violent rape of a kidnapped toddler who dies from internal injuries and is thrown in a hole. ROA.1458; GX 9A. The stories written by Arthur involve crude descriptions of incest and rape. ROA.1459, GX 35AA, 35BB.

These stories are not serious works of art or literature. They are precisely the type of "'hard core' pornography," *Miller*, 413 U.S. at 29, that the Supreme Court has made clear is unprotected under the First Amendment. In a case involving a website similar to Arthur's, the Eleventh Circuit conducted an independent review of the materials and determined that they lacked serious literary, artistic, political, or scientific value. *United States* v. *McCoy*, 602 Fed. Appx. 501, 505 (11th Cir. 2015) (finding that stories on the defendant's website, which had "tenuous plots at best" and "graphically describe sexual acts, incestuous relationships, molestation, masturbation, sexual abuse, rape,

intercourse, violent acts, and arguably the torture and/or murder of very young children," fell outside the First Amendment's protection).[5]  The Court should make the same determination here.

3.     Arthur lists (Br. 47) famous written works such as *The Color Purple* by Alice Walker, *Absalom, Absolam!* by William Faulkner, *Lolita* by Vladimir Nabokov, and the film *American Beauty*, and observes that these works feature "adult/child sexual interactions."  But general similarities to serious art do not elevate the stories on Arthur's website to that status.  Thus, in *United States* v. *Schein*, 31 F.3d 135 (3d Cir. 1994), the Third Circuit rejected the defendant's attempt to equate the materials he distributed—videos depicting sexual conduct "among homosexual males" involving "urination"—with "photographs of 'urolagnic' pornography by Robert Mapplethorpe [that] were shown at an exhibit funded by the government's National Endowment of the Arts."  31 F.3d at 136-137.  The stories on Arthur's website similarly are not works of art merely because works that indisputably possess substantial artistic merit also involve sexual interaction between adults and minors.

Even if the Court assumes that the stories on Arthur's website possess some modicum of literary, artistic, political, or scientific value, the stories

---

[5]     Frank McCoy is an author who submitted stories to Arthur's website. ROA.76.

nevertheless satisfy the third prong of the *Miller* obscenity standard.  Under the third prong, a work falls outside the definition of obscenity only if, taken as a whole, it possesses "serious" societal value.  *Miller*, 413 U.S. at 24; *Stevens*, 559 U.S. at 479.  Any societal value possessed by the stories on Arthur's website is *de minimis* and dwarfed by the patently offensive descriptions of sexual conduct contained in the stories.  In fact, it is clear from the content of the stories, and their context, that their dominant—if not sole—intended function was to appeal to the prurient interest of those who would find the stories sexually arousing.  The stories do not possess serious literary, artistic, political, or scientific value.[6]

4.     Arthur contends (Br. 47-49) that this Court should find the evidence insufficient to prove that the stories are obscene because, in his view, the government "should have to . . . prove the distinction between famous works of art which depict adult/child sexual conduct and the challenged stories."  Br. 49.  He is wrong.

To the extent Arthur suggests that the United States was required to call a witness who could distinguish the stories posted on his website from *Lolita* or

---

[6]     To the extent Arthur suggests (Br. 42-47) that text-only obscenity is entitled to greater protection than visual depictions under the First Amendment, he is wrong.  In *Kaplan*, the Supreme Court made clear that "expression by words alone" can constitute obscenity that falls outside the First Amendment's protection.  413 U.S. at 118-119; *id.* at 119-120.

*American Beauty*, the Supreme Court and this Court have repeatedly held that the government need not introduce expert testimony to prove that a work is obscene and can rely solely on the contents of the work.  *Paris Adult Theatre I*, 413 U.S. at 56 & n.6; *Kaplan*, 413 U.S. at 121; *Hamling*, 418 U.S. at 100; *Ragsdale*, 426 F.3d at 772; *United States* v. *Slepicoff*, 524 F.2d 1244, 1247-1248 (5th Cir. 1975); *United States* v. *Thevis*, 484 F.2d 1149, 1153 (5th Cir. 1973).  There is no "constitutional need for 'expert' testimony on behalf of the prosecution, or for any other ancillary evidence of obscenity, once the allegedly obscene material itself is placed in evidence."  *Kaplan*, 413 U.S. at 121 (citing, *inter alia*, *United States* v. *Groner*, 479 F.2d 577, 579-586 (5th Cir. 1973) (en banc)).  With access to the material, the jury can decide whether a reasonable person would find it lacking in any serious literary, artistic, political, or scientific value.  See *McCoy*, 602 Fed. Appx. at 504-505 ("[The] stories, introduced into evidence, constituted the 'best evidence' of whether the stories lacked serious literary, artistic, political, or scientific value.") (quoting *Paris Adult Theatre I*, 413 U.S. at 56-57).  The jury reasonably made that determination here.

## IV.    SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING THAT THE IMAGES DISPLAYED ON ARTHUR'S WEBSITE DEPICT MINORS

Arthur contends (Br. 34-41) that the government failed to prove that the images charged in Counts 1, 8, and 9 depict minors.  He is incorrect.

## A.    Background

With respect to the images charged in counts 1, 8, and 9, Arthur argued in his post-trial Rule 29 motion for judgment of acquittal that the government had failed to prove that the subjects depicted in the drawings "were, or appeared to be, minors." ROA.587. The district court denied the motion. R.693-695. It determined that there was sufficient evidence from which the jury could determine that the drawings depicted minors, "including the material charged itself." ROA.695.

## B.    Standard Of Review

With respect to the factual question whether the visual depictions involve minors, this Court will affirm "if a reasonable trier of fact could conclude from the evidence that th[is] element[] of the offense w[as] established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Ragsdale*, 426 F.3d at 770. Issues of statutory interpretation are reviewed de novo. *United States* v. *Arrieta*, 862 F.3d 512, 514 (5th Cir. 2017).[7]

---

[7]    Arthur contends (Br. 34) that his challenge to the jury's determination that the images depicted minors is an as-applied constitutional challenge that is reviewed under "strict scrutiny." He is incorrect. Arthur mistakenly states (Br. 35-36) that the statute can be "unconstitutional as applied to [him] if there is no proof that the subject work actually depicts a minor." But obscene materials need not include minors to be excluded from constitutional protection. See *Free Speech Coalition*, 535 U.S. at 245-246. Section 1466A prohibits visual depictions

### C.    The Evidence Was Sufficient For The Jury To Determine That The Images on Arthur's Website Depict Minors

1.    For the user profile images described in Counts 1, 8 and 9, the jury convicted Arthur on three counts of obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. 1466A(a)(1).  That statute makes it unlawful for any person to "knowingly produce[], distribute[], receive[], or possess[] with intent to distribute a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting" that (i) depicts a minor engaging in sexually explicit conduct and (ii) is obscene.  18 U.S.C. 1466A(a)(1).  The PROTECT Act of 2003, Pub. L. No. 108-21, § 504, 117 Stat. 650, 680-682 (2003), in which Section 1466A was enacted, defines "minor" as "a person who has not reached 18 years of age." 18 U.S.C. 25(a)(2). Section 1466A(c) provides that "[i]t is not a required element of any offense under this section that the minor depicted actually exist."

2.    Sufficient evidence supports the jury's determination that the images charged in Counts 1, 8, and 9 depict minors.  As to Count 1, FBI Special

---

of minors only when they are obscene.  See 18 U.S.C. 1466A(a)(1)(B).  Thus, regardless of whether Section 1466A(a)(1) requires an actual minor, it is a valid restriction on obscene speech under *Miller*.  See *United States* v. *Whorley*, 550 F.3d 326, 337 (4th Cir. 2008) (finding defendant's "as-applied constitutional challenge to [Section] 1466A(a)(1) to be without merit" for this reason); *United States* v. *Schales*, 546 F.3d 965, 973-974 (9th Cir. 2008).

Agent Jeremy Ewan testified that the relevant image is a drawing of a "prepubescent or pubescent . . . female child lying nude." ROA.1098; see GX 10A. And user Netman169's biography, viewable next to the profile image, provides additional context by stating that he specializes in stories about little girls having sex and was inspired by a story he heard as a teenager from a friend who had allowed three friends to have sex with his 10-year-old sister. ROA.1457; see ROA.1098-1099; GX 10A.

The image charged in Count 8 depicts a girl with pigtails lying on her stomach on a bed. ROA.1458; GX 12A. She is performing fellatio and the size of her head is less than the visible length of the penis in her mouth. ROA.1458; GX 12A. The girl's chest is also visible and has no breast development. ROA.1458; GX 12A. Similarly, the image charged in Count 9 resembles a Japanese anime drawing and depicts three girls with pigtails each performing fellatio on an adult male penis that is large in comparison to the girls. ROA.1457; GX 11A. One girl has her dress lifted in front and has no pubic hair, and a teddy bear appears in the background. GX 11A.

The "details in the images, such as clothing or hairstyle," any "obviously prepubescent features" such as no breasts or pubic hair, and the size of the girls "relative to the adults with whom they are engaged in sexual activity" all support the jury's determination that the images depict minors. *United States* v. *Eychaner*,

326 F. Supp. 3d 76, 89-90 (E.D. Va. 2018); see *United States* v. *Whorley*, 550 F.3d 326, 330 (4th Cir. 2008) (affirming convictions under 18 U.S.C. 1466A(a)(1) in case involving "Japanese anime-style cartoons of children engaged in explicit sexual conduct with adults"); *United States* v. *Bowersox*, 72 M.J. 71, 73 (C.A.A.F. 2013) (affirming convictions under 18 U.S.C. 1466A(b)(1) in case involving "anime images that depicted minors engaging in sexual activities").

3.    Arthur contends (Br. 35-41) that for a conviction under Section 1466A(a)(1), this Court should require the United States to prove that the obscene images at issue depict actual minors, not fictional characters. This Court should reject that argument.

The prefatory language of Section 1466A makes it clear that Section 1466A(a)(1) prohibits the receipt of an obscene "visual depiction of any kind, *including a drawing, cartoon, sculpture, or painting*," of a minor engaging in sexually explicit conduct. 18 U.S.C. 1466A (emphasis added). It is true that a drawing, cartoon, sculpture, or painting can depict a real person. But the statute explicitly states that "[i]t is not a required element of any offense under this section that the minor depicted actually exist." 18 U.S.C. 1466A(c). The statute thus makes clear that a defendant can be convicted under Section 1466A for distributing or receiving drawings or cartoon images, and those images need not depict actual children.

Every court to consider this question has rejected Arthur's argument. See

*Whorley*, 550 F.3d at 336 (rejecting argument that cartoon images are covered

under Section 1466A only if they depict real children and stating that Section

1466A(c) "unambiguously states that '[i]t is not a required element of any

offense under this section that the minor depicted actually exist.'") (quoting 18

U.S.C. 1466A(c)); *United States* v. *Schales*, 546 F.3d 965, 973-974 (9th Cir. 2008)

(Section 1466A(c) "explicitly provides that '[i]t is not a required element of any

offense under this section that the minor depicted actually existed.'") (quoting

18 U.S.C. 1466A(c)); *Bowersox*, 72 M.J. at 74 (rejecting defendant's argument

that Section 1466A requires proof that the image represents a "real" minor and

noting that Section 1466A(c) "expressly states" that the government need not

prove the minor depicted actually exists); *United States* v. *Handley*, 564 F. Supp.

2d 996, 1001-1002 (S.D. Iowa 2008) ("Obscene materials are not limited to those

involving real persons and can include materials such as cartoons.").

4. In support of his argument, Arthur relies on Judge Gregory's

dissenting opinion in *Whorley*. Judge Gregory "interpret[s] subsection

[1466A](a)(1) to only criminalize material, including cartoons and drawings,

that incorporates actual children." 550 F.3d at 351 (Gregory, J., concurring in

part and dissenting in part). Judge Gregory points to two statutory features in

support of his conclusion. First, he notes that the word "minor" is defined in 18

U.S.C. 2232 as "any person under the age of eighteen years," and the word "person" is defined in the dictionary as a "living human being" with legal rights and duties, which a fictional cartoon is not. *Id.* at 351. "Thus," Judge Gregory concludes, a person can be convicted under Section 1466A(a)(1) for receiving a sexually explicit obscene caricature of a real minor, but not a fictional one. *Ibid.* Second, Judge Gregory compared the elements of 1466A(a)(1), which describes drawings and cartoons that "depict[] a minor engaging in sexually explicit conduct," and 1466A(a)(2), which describes drawings and cartoons that "depict[] an image that is, or appears to be, of a minor engaging in" specific kinds of sexual conduct like beastiality, and determined that "the only way to avoid making subsection (a)(2) superfluous is to assume that Congress only required a real child in subsection (a)(1)." See 550 F.3d at 351 (Gregory, J., concurring in part and dissenting in part); see 18 U.S.C. 1466A(a)(1) and (2).

Both observations ignore Section 1466A(c), which provides that "[i]t is not a required element of any offense under this section that the minor depicted actually exist." 18 U.S.C. 1466A(c). In Judge Gregory's view, that provision is intended to "relax the evidentiary requirements" and relieve the government of exhaustively searching child pornography databases to identify the specific minor depicted in a cartoon or drawing. *Whorley*, 550 F.3d at 351 (Gregory, J., concurring in part and dissenting in part). But the statute does not say the

government need not prove the identity of minor to convict a defendant under Section 1466A; it says that the minor need not actually exist. Moreover, "Congress provided equally clear and alternative language for doing exactly what [Arthur] describes when it defined an 'identifiable minor' in another section of the chapter—'[this definition] shall not be construed to require proof of the *actual identity* of the identifiable minor.'" *Bowersox*, 72 M.J. at 74 (quoting 18 U.S.C. 2256(9)(B); responding to defendant's reliance on Judge Gregory's concurrence). No other judge or court has adopted Judge Gregory's reading of Section 1466A(a)(1) because its language is clear: An obscene drawing or cartoon of a minor engaging in sexually explicit conduct need not depict an actual minor to be prosecuted under Section 1466A.

## V.    THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ON THE ELEMENTS OF OBSCENITY

Arthur next contends (Br. 50-54) that the jury was improperly instructed on the elements of obscenity. He is incorrect.

### A.    Background

The district court followed the Fifth Circuit's pattern instruction on obscenity. See Fifth Cir. Pattern Jury Instruction (Criminal Cases) 2.60, at 276-277 (2019 ed.). The instruction explained that: "To prove a matter is 'obscene,' the government must satisfy three tests: (1) that the work appeals predominantly to prurient interest; (2) that it depicts or describes sexual conduct in a patently

offensive way; and (3) that the material, taken as a whole, lacks serious literary, artistic, political, or scientific value." ROA.533, 1357.

The court gave the following further explanation of the third factor: "If you find that the material meets the first two tests of the obscenity definition, your final decision is whether the material, taken as a whole, lacks serious literary, artistic, political, or scientific value. Unlike the first two tests this third test is not to be decided on contemporary community standards but rather on the basis of whether a reasonable person, considering the material as a whole, would find that the material lacks serious literary, artistic, political, or scientific value. An item may have serious value in one or more of these areas even if it portrays sexually oriented conduct. It is for you to say whether the material in this case has such value." ROA.535; see ROA.1359.

Arthur requested two changes to the instruction. First, he requested that the sentence stating that "[a]n item may have serious value in one or more of these areas even if it portrays sexually oriented conduct" be modified to state that "[a]n item may have serious value in one or more of these areas even if it portrays sexually oriented conduct *in a patently offensive manner and appeals predominantly to the prurient interest.*" ROA.460 (emphasis added). Second, he requested that the final sentence stating that "[i]t is for [the jury] to say whether the material in this case has such value" be modified to instead state that "[i]t is

45

for [the jury] to say whether the material in this case *lacks* such value." ROA.461 (emphasis added).

The district court denied both requests, observing that it had tracked the Fifth Circuit pattern instruction. ROA.1321-1322.

## B.    Standard Of Review

A district court's decision to give or exclude a jury instruction is reviewed for abuse of discretion. *Ragsdale*, 426 F.3d at 779.

## C.    The District Court Did Not Abuse Its Discretion By Giving The Fifth Circuit's Pattern Instruction On Obscenity

"It is well-settled that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions" unless the instruction is an incorrect statement of the law. *United States* v. *Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009). The district court did not abuse its discretion here by giving the Fifth Circuit pattern instruction on obscenity.

1.    Arthur contends (Br. 52) that his first requested modification would have "emphasize[d]" to the jury "that each element of the offense as defined by the *Miller* test is distinct." There is no possibility that the jury did not understand it had to find three distinct elements to find the drawings and stories obscene. The court instructed the jury that "[t]o prove a matter is 'obscene,' the government must satisfy three tests" and listed the *Miller* elements as a conjunctive list. ROA.533. After defining "prurient interest" and "patently

46

offensive," the court further stated: "If you find that the material meets the first two tests of the obscenity definition, your final decision is whether the material, taken as a whole, lacks serious literary, artistic, political, or scientific value." ROA.535. That sentence makes crystal clear what Arthur thought needed further clarification: that an item can have serious value in one of those categories even if the jury has already found that the item appeals predominantly to the prurient interest and portrays sexual conduct in a patently offensive manner. See ROA.460. Finally, the court reiterated in the next paragraph that "[a]ll three of these tests must be met before the material in question can be found to be obscene. If any one of them is not met, the material would not be obscene within the meaning of the law." ROA.535.

Arthur identifies no incorrect statement of law in the instruction given, and the district court did not abuse its discretion by giving the pattern instruction. *Whitfield*, 590 F.3d at 354.

2.    Arthur further contends (Br. 53-54) that the final sentence of the district court's obscenity instruction—that "[i]t is for [the jury] to say whether the material in this case has [serious literary, artistic, political, or scientific] value—impermissibly shifted the burden of proof on the third *Miller* prong to the defense. See ROA.535. In his view (Br. 53-54), the instruction "give[s] the impression that the work starts at a point of neutrality and may either be shown

to have value or to lack value by the evidence." The court should reject that argument.

The court's instruction makes clear that the government has the burden to prove that the charged materials lack serious literary, artistic, political, or scientific value beyond a reasonable doubt. For each offense in the indictment, the instructions state that the government must prove beyond a reasonable doubt that the drawing or story is obscene. ROA.531, 535-538. The instructions state that to prove a matter is obscene, "*the government must satisfy* three tests." ROA.533 (emphasis added). And to explain the third test, the instructions twice use the exact language that Arthur requested. The court instructed the jury that the government was required to prove under the third *Miller* prong "that the material, taken as a whole, *lacks* serious literary, artistic, political, or scientific value." ROA.533 (emphasis added). And it later stated that if the jury found the first two *Miller* prongs satisfied, "your final decision is whether the material, taken as a whole, *lacks* serious literary, artistic, political, or scientific value." ROA.535 (emphasis added). The court's statement, two sentences later after describing the reasonable person test, that "[i]t is for you to say whether the material in this case has such value," ROA.535, does not somehow flip the burden of proof for the third *Miller* prong onto the defense.

48

When the jury assesses the third *Miller* prong, it is making a binary choice between whether a reasonable person would find that the material has serious societal value, or whether it does not. No matter which way the question is posed, the jury was instructed that the test is whether the material *lacks* such value, and that if the government does not satisfy that test, the material is not obscene. ROA.533, 535. Arthur has not established that the pattern instruction on obscenity incorrectly stated the burden of proof, nor could he when the instructions twice stated the test in precisely the words he requested. The district court did not abuse its discretion in giving the pattern instruction. *Whitfield*, 590 F.3d at 354; *Whorley*, 550 F.3d at 338 (district court did not abuse its discretion by declining to modify pattern jury instruction on obscenity).

3. Even if there was an error in the instruction, the court should affirm if the error was harmless. *United States* v. *Muhammad*, 14 F.4th 352, 360 (5th Cir. 2021). Here, Arthur's requested modifications to the pattern instruction reinforced or further clarified instructions that the jury had already been given. He identifies nothing in the record to indicate that the jury's verdict would have changed if the district court had adopted his modifications.

## VI. THE SENTENCE IMPOSED BY THE DISTRICT COURT IS PROCEDURALLY REASONABLE

Finally, Arthur contends (Br. 55-61) that his sentence is procedurally unreasonable because the district court relied on information in the Presentence

49

Investigation Report (PSR) that Arthur views as insufficiently reliable. The Court should reject that argument.

## A. Background

1. In the PSR, the Probation Office calculated a base offense level of 22. ROA.1462. After adjustments for material involving prepubescent minors, distribution for pecuniary gain, and use of a computer, the Probation Office calculated a total offense level of 42. ROA.1462-1463. Combined with a Criminal History Category of I, Arthur's advisory Guidelines range was 360 to 1080 months of imprisonment. ROA.1466, 1471.

In a section of the PSR entitled "Offense Behavior Not Part of Relevant Conduct," the Probation Office included information about several interviews conducted by the FBI in 2019. ROA.1463-1465. In one interview, a woman who had been married to a friend of Arthur stated that in 1992, Arthur convinced her that her husband was cheating, causing the woman and her children to move in with Arthur (although she was not romantically involved with him). ROA.1463. She and her children later moved out and when she returned to Arthur's home to retrieve her things, she found VHS tapes with her name that contained recordings of Arthur having sex with her. ROA.1463. She had no memory of having sex with Arthur and believed she had been drugged. ROA.1463-1464. The PSR further stated that in June 1998, Arthur sent an email

to an unidentified man stating, "I used to do many unspeakable things to my last girlfriend while she slept . . . she was on heavy medication and couldn't remember a thing the next morning except that her 'booty-hole' hurt (!!!!), but she sure got off to it in her sleep." ROA.1464.

In another interview, a woman described being sexually abused by Arthur in 1983 and 1984, when she was four and five years old. ROA.1464. She had accompanied her father to Arthur's house to harvest a marijuana crop, and she was left alone with Arthur while her father made marijuana deliveries. ROA.1464. Arthur touched her all over her body, put his fingers in her vagina and anus, exposed his penis, and masturbated next to her. ROA.1464. When she was left alone with him again the following year, Arthur asked her to get into his bed and she did not remember what happened next. ROA.1464.

The FBI also interviewed the woman's mother, who stated that when her daughter was four or five years old, she noticed that the daughter's genital area was red and inflamed and took her to a pediatrician who was unable to determine if the child had been sexually abused. ROA.1465. The daughter had disclosed to her mother about 10 years earlier that she had been sexually abused by one of her father's friends when she was a child. ROA.1465.

The Probation Office determined that the information was not "relevant conduct" under Guidelines § 1B1.3. ROA.1463; see ROA.1479-1480.

Accordingly, the information had no effect on the advisory Guidelines range. See Guidelines § 1B1.3. Instead, the Probation Office suggested that the district court could use the information as grounds for an upward variance under 18 U.S.C. 3553(a). ROA.1474. The Probation Office explained that the information was relevant to the history and characteristics of the defendant and the need to protect the public from harm. ROA.1474-1475 (citing 18 U.S.C. 3553(a)(1) and (a)(2)(C)).

Arthur objected to the inclusion of the interview summaries in the PSR, stating that he had no way to refute or confront them. ROA.1487-1488; see ROA.1478, 1491. The Probation Office determined the information was reliable and therefore should remain in the PSR. ROA.1480, 1485.

2. The district court overruled Arthur's objections to the PSR for the reasons stated by the Probation Office. ROA.1431-1432. It adopted the PSR's advisory Guidelines range of 360 to 1080 months of imprisonment. ROA.1433. The court declined to depart from the advisory Guidelines range. ROA.1441. After clarifying that it had considered the Guidelines and the sentencing factors set forth in 18 U.S.C. 3553(a), the court sentenced Arthur to 480 months of imprisonment—"well toward the lower end" of the advisory Guidelines range. ROA.1444; see ROA.714. The sentence was broken down as follows: 240 months on Count 1; 60-month consecutive sentences for Counts 2 through 5;

and 60-month concurrent sentences for Counts 6 through 9.  ROA.714.  The court stated that even if it had granted all of Arthur's objections, it would have imposed the same sentence.  ROA.1444.

### B.    Standard Of Review

In reviewing claims of procedural error, this Court reviews a "district court's interpretation and application of the Sentencing Guidelines de novo and its findings of fact for clear error."  *United States v. Peterson*, 977 F.3d 381, 392 (5th Cir. 2020) (internal quotation marks omitted).

### C.    The District Court Did Not Rely On Any Clearly Erroneous Facts In Imposing Arthur's Sentence

1.    A district court commits procedural error at sentencing if "it miscalculates or fails to calculate the proper Guidelines range; it treats the Guidelines as mandatory; it imposes a sentence based on clearly erroneous facts; it fails to consider the factors set forth in 18 U.S.C. § 3553(a); or it fails adequately to explain its chosen sentence or any deviation from the Guidelines range."  *United States v. Rowan*, 530 F.3d 379, 381 (5th Cir. 2008).

"When making factual findings for sentencing purposes, district courts may consider any information which bears sufficient indicia of reliability to support its probable accuracy."  *Peterson*, 977 F.3d at 396 (internal quotation marks omitted).  "In general, a PSR bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual

determinations." *Ibid.* (internal quotation marks omitted). When a district court treats facts in a PSR as reliable and relies on those facts at sentencing, the defendant has the burden to "demonstrate that the information cannot be relied upon because it is materially untrue, inaccurate or unreliable," and "[m]ere objections are generally insufficient for a defendant to discharge his burden." *Ibid.* (internal quotation marks and brackets omitted).

In all events, a district court "need not discuss all the facts and reasoning relevant to its guidelines calculation." *United States v. Eustice*, 952 F.3d 686, 692 (5th Cir. 2020). "An adoption of the PSR's factual findings and conclusions is sufficient as long as those findings and conclusions are adequate to support the sentence imposed." *Ibid.*

2.    Arthur contends (Br. 60-61) that the district court procedurally erred by basing its sentence on unreliable facts in the PSR. The Court should reject that argument.

The Probation Office stated that the sexual abuse allegations in the PSR are reliable and specifically noted that the information had been corroborated. ROA.1480, 1484-1485. The FBI spoke to the mother of the woman who said she was sexually abused by Arthur as a child, who confirmed she had taken her daughter to the pediatrician when she was four or five to address redness and inflammation in the child's genital area. ROA.1465. The mother and daughter

both told the FBI that the daughter had disclosed the abuse to her mother about 10 years earlier.  ROA.1465.  And an email from Arthur corroborated the information given by the woman who reported being sexually abused by Arthur in her sleep.  ROA.1463-1464.  The district court overruled Arthur's objection to including the information in the PSR "for the reasons stated by [the Probation Office]," ROA.1431-1432, indicating that the court agreed the information was reliable, ROA.1480, 1484-1485.  The district court did not err, much less clearly err, in finding the information reliable.  See *Peterson*, 977 F.3d at 393-394 (incidents described in PSR with 16-year-old girl and 32-year-old woman found to be sufficiently reliable).

Furthermore, even if the information was unreliable, the district court did not explicitly rely on the FBI interviews when it imposed a 480-month sentence. The Probation Office determined that the information was not "relevant conduct," so it had no bearing on the calculation of Arthur's advisory Guidelines range.  ROA.1480.  The Probation Office had suggested that the district court could rely on this information to support an upward variance, ROA.1474-1475, but the court specifically declined to do so and imposed a within-Guidelines sentence toward the low end of the Guidelines range. ROA.1441.

Arthur suggests (Br. 3, 58) that the district court's consideration of the Section 3553(a) factors led it to run the terms of imprisonment for several counts consecutively to one another, which he portrays as similar to an upward variance. But the consecutive sentences were the result of a straightforward application of Guidelines § 5G1.2(d), which provides that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less that the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." Counts 1, 8, and 9 carried a statutory maximum of 20 years (240 months), which is less than the total punishment of 480 months that the district court had selected from within the Guidelines range. ROA.1470-1471; see 18 U.S.C. 1466A(a)(1), 2252A(b)(1). Accordingly, the court imposed consecutive 60-month sentences for several of the Section 1462(a) counts until it arrived at 480 months, then imposed concurrent sentences for the remaining counts. ROA.714. Arthur's suggestion that the district court structured the sentence this way to account for the sexual abuse information included in the PSR is unfounded.

In any event, even assuming that some procedural error occurred, "[a] procedural error during sentencing is harmless"—and therefore not reversible— "if the error did not affect the district court's selection of the sentence imposed."

*United States v. Leontaritis*, 977 F.3d 447, 452 (5th Cir. 2020) (internal quotation marks omitted). Here, the district court explicitly stated that even if it had granted all of Arthur's objections to the PSR, it would have imposed the same sentence. ROA.1444. Any error in the inclusion of the interview summaries in the PSR was therefore harmless.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

s/ Ann Adams

ASHLEY C. HOFF
  United States Attorney
  Western District of Texas

MONICA R. MORRISON
  Assistant United States Attorney
  Middle District of Tennessee

AUSTIN M. BERRY
  Trial Attorney, Child Exploitation
  and Obscenity Section
  Criminal Division

KENNETH A. POLITE, JR.
  Assistant Attorney General

LISA H. MILLER
  Principal Deputy Assistant
  Attorney General

ANN O'CONNELL ADAMS
  Criminal Division, Appellate
  Section
  U.S. Department of Justice
  950 Pennsylvania Ave. NW, Rm. 1517
  Washington, DC 20530
  (202) 514-4086
  ann.adams@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on April 14, 2022, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to the following registered users:

Lane A. Haygood
3800 E. 42nd Street, Suite 110
Odessa, Texas 79762
Tel.: (432) 803.5800
Fax: (432) 225-1062
lhaygood@galyen.com
*Counsel for Thomas Alan Arthur*

Dated: April 14, 2022

s/ Ann Adams
Ann O'Connell Adams
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave. NW, Rm. 1517
Washington, DC 20530
(202) 514-4086
ann.adams@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  This brief contains 12,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Calisto MT 14-point font.

3. This brief complies with the privacy redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

4. This brief complies with the electronic submission of 5th Cir. R.25.2.1, because it is an exact copy of the paper document.

5. This brief is free of viruses because it has been scanned for viruses with the most recent version of a commercial virus scanning program.

Dated: April 14, 2022

<div style="margin-left: 40%;">

s/ Ann Adams

Ann O'Connell Adams
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave. NW, Rm. 1252
Washington, DC 20530
(202) 514-4086
ann.adams@usdoj.gov

</div>